1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3    UNITED STATES OF AMERICA      .
                                   . H-09-CR-336-2
4            vs.                   . HOUSTON, TEXAS
                                   . JUNE 9, 2011
5                                  . 10:52 A.M.
     MICHAEL N. SWETNAM, JR.       .
6    . . . . . . . . . . . . . . .

7

8

9              TRANSCRIPT OF SENTENCING HEARING
             BEFORE THE HONORABLE KEITH P. ELLISON
10                UNITED STATES DISTRICT JUDGE

11

12      *THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
    THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
13  COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
    ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
14  COPY AT THE OFFICIAL RATE.
        General Order 94-15, United States District Court,
15  Southern District of Texas.*

16

17   A P P E A R A N C E S:

18   FOR THE GOVERNMENT:

19        Gregg Costa
          Kristine E. Rollinson
20        Assistant US Attorney
          PO Box 61129
21        Houston, Texas   77208-1129

22

23

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
25                              - - - - -

```
 1   A P P E A R A N C E S:  (Continued)

 2   FOR THE DEFENDANT:

 3        Michael Emory Clark
          Duane Morris, LLP
 4        3200 Southwest Freeway
          Suite 3150
 5        Houston, Texas 77027-7540

 6        Irvin Sheldon Weisfeld
          Attorney at Law
 7        855 E. Harrison Street
          Brownsville, Texas 78520

 8

 9   A P P E A R A N C E S:  (Continued)

10   OFFICIAL COURT REPORTER:

11        Cheryll K. Barron, CSR, CM, FCRR
          U.S. District Court
12        515 Rusk Street
          Houston, Texas  77002
13

14                         - - - - -

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

10:52  THE COURT:  Okay.  Let's turn to the United States versus Swetnam.

MR. COSTA:  Gregg Costa for the United States.  Good

10:52  morning, your Honor.

THE COURT:  Good morning.

MR. COSTA:  I'm also joined by Kristine Rollinson, from our office, who is handling the forfeiture aspect.

THE COURT:  I know Ms. Rollinson from years ago.

10:53  Welcome.

MS. ROLLINSON:  Thank you.

MR. CLARK:  Good morning, your Honor.  Michael Clark and Sheldon Weisfeld for Mr. Swetnam.

THE COURT:  Mr. Weisfeld is someone else I've known

10:53  for a long time.  Welcome to all of you.

MR. WEISFELD:  Good morning, your Honor.  Good to see you.

THE COURT:  You returned to good health?

MR. WEISFELD:  Yes, thank God, your Honor.  No more

10:53  health issues.  I think it was just a situation of stress; and I, you know, haven't had any more re-occurrences, thank God.

THE COURT:  Health problems put every other problem in perspective, I think.

MR. WEISFELD:  Without a doubt, your Honor.

10:53  THE COURT:  Good morning, Mr. Swetnam.

10:53   1          THE DEFENDANT:  Good morning, your Honor.

2          THE COURT:  All right.  Of course, I remember this

3     case well.  I have reviewed --

4          THE PROBATION OFFICER:  Good morning, your Honor.

10:54   5     Hugo Renteria with probation, your Honor.

6          THE COURT:  Thank you.

7             Okay.  I've reviewed Mr. Renteria's report.  Are

8     you -- have you reviewed it with your client, gentlemen?

9          MR. CLARK:  We have, yes, your Honor.

10:54  10          MR. WEISFELD:  Yes, your Honor.

11          THE COURT:  Which of you would like to speak first?

12     I'll make time for all of you, of course.

13          MR. CLARK:  Your Honor, I will speak to the objections

14     to the PSR and to the government's responses and probation

10:54  15     officer's responses if I could.

16          THE COURT:  Yes, sir.

17          MR. CLARK:  We were given a copy of the probation

18     officer's responses, and we understand the position that he's

19     taken.  Let me start with, I guess, the last position that he's

10:54  20     taken, which I think is just erroneous.

21             He indicates that because the government hasn't

22     moved for a 5K that a downward departure is not in order.  And

23     we agree in principle with that.  But we're not talking about a

24     downward departure.

10:54  25             We're talking about a variance sentence.  And to

10:55   1    the extent that the Booker and the Blakely and those cases have
        2    come down, it's a totally different argument, your Honor.
        3              THE COURT:   Okay.   I didn't know what 5K was doing in
        4    the mix.   Okay.   Very well.
10:55   5              MR. CLARK:   So, we have set out our positions in our
        6    objections to the PSR, which we're happy to go through with the
        7    Court.   And I just don't want to be redundant, Judge.   We've
        8    set out why we think that we're right and why we think that
        9    these adjustments are not appropriate as to the abuse of a
10:55   10   position of trust.
        11             THE COURT:   Okay.
        12             MR. CLARK:   And --
        13             THE COURT:   Well, I do have your writings.   If there's
        14   anything you would like to add to that, that's fine.
10:55   15             MR. CLARK:   No.   Again, I think it would be redundant.
        16             The Court would be within it's province to find
        17   that the position of trust enhancement is not appropriate.   And
        18   we would ask the Court to find --
        19             THE COURT:   Are you saying that it can't be
10:56   20   appropriate in any position between -- any tandem between the
        21   insurance broker and a client or are you saying in this
        22   particular case it does not meet that threshold?
        23             MR. CLARK:   I think in this particular case, is our
        24   position, given the factual scenario.   I'm not saying
10:56   25   categorically, no.   I think that's what the Eleventh Circuit is

10:56  1    basically pointing out, that -- it's a fact determinant type of

2    analysis, your Honor.

3               And, as you recall, the facts in this case were

4    such that, you know, clearly he's not fiduciary.  Under the law

10:56  5    he's not a fiduciary.  So then you go to the question of

6    position of trust.  And here, he was exercising a close,

7    ongoing relationship.  There's no doubt about that.

8               But the other facts were that the hospital was

9    looking at the insurance policies and getting input from other

10:56  10   people.

11              And, again, it's a fact issue.  The Court can go

12   either way.  We realize that.  But we think that in this case

13   that it's not an appropriate adjustment.  That's our position.

14              As to the automatic two-point denial of

10:57  15   acceptance of responsibility, again, I think that our position

16   is that the commentary accompanying that particular guideline's

17   provision says that if the defendant is putting the government

18   to its proof ordinarily acceptance of responsibility is not

19   appropriate, unless there are questions of law that are being

10:57  20   litigated.  And the defendant in this case actually litigated

21   those questions of law.

22              We understand that the jury has spoken.  We

23   understand that the record has to be viewed, but -- we're not

24   trying to re-litigate the case, your Honor.  But we did, in

10:57  25   good faith, take positions of law as to him being an authorized

10:57  1    agent and --

2                THE COURT:  But in terms of his acceptance of

3    responsibility, how do we square what you've said with the fact

4    he's apparently suing the hospital?  I mean --

10:58  5                MR. CLARK:  Well, that's -- he's suing the hospital in

6    the name of the government, by the way.  He's suing the

7    hospital as a qui tam relator, claiming that the hospital stole

8    money from the federal government program Medicare by

9    essentially -- it's the anti-kickback and Stark violations,

10:58  10   your Honor, that he's alleging that they have basically tainted

11   claims that go back to inducing all these physicians, which the

12   law prohibits.

13               And, so, as pointed out, you know, he has

14   basically brought to the attention of the United States and

10:58  15   then filed this lawsuit in the name of the federal government

16   under the False Claims Act.  As you know, billions of dollars

17   have been recovered in cases of this nature.  So, it's not

18   related -- as Mr. Lewis points out in his letter to the Court,

19   that Sweezy case is not related to this case and that's -- I

10:59  20   think we have supplied to the Court the qui tam action.

21               It's an ironic situation that he is essentially

22   bringing this lawsuit against the purported victim in this

23   case.  I think it's apples and oranges, Judge.

24               THE COURT:  Okay.

10:59  25               MR. CLARK:  And unless there's other questions --

10:59  1          THE COURT:  No.  Let me -- do you want to say

       2   anything?

       3          MR. WEISFELD:  I do, your Honor.

       4              Regarding the position of trust, your Honor,

10:59  5   there really is -- I think if you remember, there's a layer

       6   here.  Smith Reagan, David Smith and Joe Reagan, were the ones

       7   that dealt with the hospital.  He, in his position as a

       8   reinsurance agent, didn't have direct relationship with the

       9   hospital.  And I think that was an element that may not have

10:59 10   been explained that I believe that now your Honor understands.

      11              How can he have a position of trust?  He doesn't

      12   deal directly with the hospital.  That wasn't his position.

      13              And, in addition, your Honor, Frank Crystal

      14   Company in 2005 received $87,000 from the hospital, analyzing

11:00 15   their insurance policies.  In 2006 Marsh McLennan received

      16   $257,000 aiding the hospital, analyzing their insurance.  And

      17   in 2007 Alliant, Lorriane Lewis, their representative, had

      18   received over $300,000.

      19              I would say, how could he have that position of

11:00 20   trust, your Honor, if they -- this is not a -- this isn't a --

      21   this is an experienced, qualified company that had eight

      22   representatives in between their insurance providers and

      23   theirselves.  That's why I believe that the position of trust

      24   is -- should not be applicable in this situation.

11:01 25          THE COURT:  Okay.  All right.

11:01  1          MR. WEISFELD:  In addition, your Honor, I think the

2     issue about the qui tam, the civil lawyers that were

3     representing him in the civil suit were the ones that, by

4     analyzing the case, they saw that the hospital had a

11:01  5     relationship with their doctors where no one else in that

6     community, no other hospital -- they locked down all the

7     doctors.

8          In addition, your Honor, the statement made by

9     Mr. Vela, saying that the qui tam claim was frivolous -- I sat

11:01  10    in on the hearing before Judge Hannan, and Judge Hannan found

11    that the case was viable.  And the case is still --

12          THE COURT:  Yeah, I saw that.

13          MR. WEISFELD:  And I would think, your Honor, that --

14    I know Mr. Vela wasn't present; but I know that on the date

11:01  15    that he wrote that statement that he knew that this case wasn't

16    frivolous that Judge Hannan -- and I presented to your Honor

17    the first amended petition.  I was present.  It's being

18    pursued.  The government may not be pursuing it now.  They

19    passed it back, but there's two law firms that are continuing

11:02  20    to represent the claim of the government.

21          Your Honor, I've come to know this man very

22    dearly.  The date of the trial, your Honor, I was coming with

23    his wife in the car.

24          THE COURT:  I remember that.

11:02  25          MR. WEISFELD:  And I -- I and my family owe a great

11:02   1   debt to him.

2           THE COURT:  I understand that.

3           MR. WEISFELD:  Mr. Lewis, who I've been on the other

4   side of for -- since I've been practicing law, I've known him

11:02   5   over 30 years -- would not have written this letter -- as

6   Mr. Clark said, he would not have written this letter as a 5K,

7   and that was the understanding with Mr. Costa.  It was -- a US

8   Attorney found that his information was valid enough to pursue

9   a case against an individual.  And if a United States -- the

11:03   10  person started trial, there was -- the judge decided that there

11  was a mistrial, and the defendant then plead guilty.  That

12  person is serving 70 months in federal custody as well as

13  $40 million that he's responsible for.

14          Your Honor, on the qui tam claim, I was present

11:03   15  when we were in Washington, DC.  And there were five or six

16  government representatives there, including the local US

17  Attorney that was initially in charge of the case.  They

18  surveyed the case; and, after their survey of the case, they

19  decided they were going to pursue it.

11:04   20          Just before reopening it, they decided they were

21  not going to pursue it.  But after a hearing before Judge

22  Hannan, with civil attorneys representing the claims of the

23  government, Judge Hannan decided that the case was viable.

24          Your Honor, after 23 years of working with this

11:04   25  Valley Baptist Hospital, they had not one single claim, as

11:04  1    their insurance reinsurer, that Swetnam Insurance Services did

2    not completely take care of.  In the year after Swetnam

3    Insurance is no longer their representative and Alliant and

4    Lorriane Lewis is their representative, they have a

11:04  5    30 million-dollar lawsuit pending against the insurance company

6    from after a storm that they're being -- they were not paid

7    for.  So, it's -- I find it --

8        THE COURT:  You're saying that his successor, then --

9        MR. WEISFELD:  Dropped the ball.

11:05  10       THE COURT:  -- did not provide the appropriate

11   coverage.  All right.

12       MR. WEISFELD:  Your Honor, if I ever see -- you know,

13   I've been practicing now it's 40 years -- that a variance would

14   be appropriate in a case, this is the one, your Honor.

11:05  15       THE COURT:  Okay.  Thank you very much.

16           Mr. Swetnam, do you wish to speak?

17       THE DEFENDANT:  Yes, sir, I do.

18       THE COURT:  Okay.

19       THE DEFENDANT:  There has not been a single day that I

11:05  20   haven't regretted getting involved in this.  And I'm sorry.

21   I'm sorry for my family, the pain that I've caused them.

22           Right now I'm close to completely financially

23   broke.  And what's so sad is we begged the civil attorney to

24   reamend their suit so that we could get it covered under my

11:06  25   errors and omissions insurance.  There was $2 million available

11:06  1   to pay them, and they didn't want it.  After begging them.  I'm

2   sorry.  That's all I can say.

3          THE COURT:  Okay.  Thank you very much.

4             Mr. Costa?

11:06  5          MR. COSTA:  Your Honor, there's a number of issues I

6   think that have been raised that I want to address.  I'll start

7   with the big picture and then address some of the specific

8   issues.

9             And I read all the submissions from the defense,

11:06  10  including some very nice letters from family and a minister.  I

11  don't doubt for a second that Mr. Swetnam is a good family man,

12  he's been a good member of his community, he's been good to his

13  friends.  But that doesn't distinguish him from 95 percent of

14  the people who come in here for sentencing as criminal

11:06  15  defendants.  Most of them are good to their family.  They're

16  good people generally.  They just got involved in a bad

17  situation, like Mr. Swetnam.

18             What does distinguish Mr. Swetnam is that this

19  was not a crime of desperation.  And so many of the defendants

11:07  20  who come into this court do so because they committed a crime

21  out of desperate situations.

22          THE COURT:  That's true.  That's true.

23          MR. COSTA:  Maybe it's someone from Mexico or Central

24  America -- we just saw the prior sentencing -- who is illegally

11:07  25  re-entering the country because that's the only way they can

11:07  1    make a living for their family or maybe it's a young person who

2    is dealing drugs because in the community where he was raised

3    that's the only thing he see as a way to make any money.

4              Mr. Swetnam wasn't in that situation of

11:07  5    desperation.  He was a respected businessman.  He was making a

6    very good income.  He had everything going for him; and, yet,

7    he still found the need to defraud people who had been not just

8    business -- he had a business relationship with but people that

9    he was friends with and that he trusted and trusted him.

11:07  10             So, to me, it -- it's -- Mr. Swetnam is more

11   culpable because he didn't need to commit this crime out of any

12   desperation.  Whether it was for greed or because he thought he

13   could outsmart people or a combination of both, I don't think

14   it helps him that -- you know, they're trying to say, "Oh, he's

11:08  15   given up his insurance license," all these other things.  It

16   shouldn't benefit him he was a successful business person.  In

17   my mind, that makes it less understandable why he commits this

18   offense.

19             There are a few other factors that I think are

11:08  20   relevant when you look at the nature and circumstances of the

21   offense.  The first is that this was not an impulsive action.

22   It went on over a couple of years.  It took a lot of planning,

23   forging documents, creating fake documents.  It was a

24   deliberate, planned crime.

11:08  25             Secondly, it was an abuse of trust.  And I'll

11:08  1  talk about that more in a second.  But I think it was clearly

2  one of the more egregious cases of abuse of trust that I've

3  seen, given his long-standing relationship and the fact that he

4  made -- legitimately made a lot of money from the hospital over

11:08  5  a number of years and then decided to abuse that relationship

6  and defraud a non-profit hospital of millions of dollars.

7          And, third, is the fact that the loss is

8  approximately $4 million, the economic loss.

9          But I think that actually understates the

11:09  10  potential harm or the magnitude of Mr. Swetnam's crime because,

11  for two years, he -- the hospital did not have this windstorm

12  coverage at the higher layers.  So, probation, rightly so, is

13  holding him responsible for the money the hospital paid for

14  those non-existent policies.  But the real threat from

11:09  15  Mr. Swetnam's crime is that if a storm had hit during one of

16  those two years, a severe storm had hit, the hospital could

17  have gone under because they wouldn't have had any coverage.

18          The next year, a storm did hit.  I know

19  Mr. Weisfeld is saying there's some dispute over coverage, as

11:09  20  often happens, as the Court knows, when you have large

21  insurance claims.  But at least there was a policy.  If that

22  had hit when Mr. Swetnam was there, who knows what could happen

23  to this hospital that provides all kinds of services to a

24  mostly poor Medicare and Medicaid community.

11:09  25          So, we do think the guideline range is reasonable

11:09  1    and the probation recommendation of 70 months is a reasonable

2    and necessary sentence to account for the nature of this crime

3    and to deter others who are in a position like Mr. Swetnam, who

4    are successful but who see because of a relationship they've

11:10  5    developed that they have the opportunity to defraud someone.  I

6    think it is important to send that message.

7            THE COURT:  How about the argument that acceptance of

8    responsibility ought to be awarded because defendant could

9    reasonably have believed that there were open questions of law?

11:10  10           MR. COSTA:  It's not a case -- the guidelines state if

11   someone is challenging the constitutionality of a statute.

12   That's not occurring.  The issue is, was -- was his conduct

13   fraud.  That's at its heart, a fact issue:  Did he have the

14   intent to deceive the hospital?  He says no.  He still says,

11:10  15   no, that he wasn't deceiving the hospital.  The jury said yes.

16   And I think the Court can make its own determination of what it

17   thinks of the evidence.  But he's clearly selling non-existent

18   policies.

19           To me, it's such a blatant fraud, the fact that

11:11  20   he's continuing to deny that and say there's some legitimacy to

21   selling policies that were just made up, companies didn't exist

22   and make them up from an offshore entity, I don't think they

23   even have a close argument on acceptance.

24           I do want to talk about their argument, the qui

11:11  25   tam and the Sweezy case.  And I want to clarify some things on

11:11   1    the qui tam.  Mr. Swetnam, for a number of years, administered

2    this insurance program that he now alleges was an illegal

3    kickback.

4              The United States --

11:11   5              MR. WEISFELD:  Your Honor, we would object.  The qui

6    tam --

7              THE DEFENDANT:  That's not true.

8              MR. WEISFELD:  Pardon me.

9              The qui tam claim is being handled in a different

11:11   10   court.  I beg to differ with Mr. Costa on the issue that he

11   either developed it or that he ran that.  I beg to differ, and

12   I think that's a rabbit trail that he's trying to take you

13   down.

14             THE COURT:  Well, whether or not it is, I allowed you

11:12   15   to speak --

16             MR. WEISFELD:  That's fine.

17             THE COURT:  -- of the qui tam, and we're going to

18   allow Mr. Costa to do likewise.

19             MR. COSTA:  Thank you, your Honor.

11:12   20             And let me say, your Honor, I didn't say he

21   developed or devised it.  I said he helped run it after it was

22   created.  That information comes from Andrew Bobb, who was the

23   AUSA in our civil section who reviewed whether the United

24   States should intervene.

11:12   25             THE COURT:  Yeah, I knew Mr. Bobb.  Is he still with

11:12   1   your office?

2        MR. COSTA:  Yes.  Yes.  He does mostly these qui tams.

3   I spoke to him a few days ago.  I didn't want to be involved in

4   obviously anything in terms of the evaluation of whether the

11:12   5   government should intervene.  But after the decision was made

6   and given the sentencing and the issues they raised, I called

7   Mr. Bobb this week and just said, "What was Mr. Swetnam's

8   involvement?"

9            And he did say he -- he didn't create it but he

11:12   10  was involved in administering it.  And that's how he knew about

11  it.  Whistleblowers typically are involved.  That's how you

12  become a whistleblower.  So, I don't think that's any --

13  negates the fraud.

14           So, he knows about this for a number of years.

11:12   15  He only files the lawsuit after the hospital fires him and

16  files a civil suit over the issues that gave rise to this

17  criminal case.  So, he wasn't riding in on his white horse

18  before anything else happened.  I mean, it was retaliatory.  He

19  only did it after the hospital fired him and then it made these

11:13   20  allegations of fraud against him.

21           And the third thing I'd say about the qui tam, my

22  understanding is all Judge Hannan did was deny a Rule 12(b)(6).

23  I mean, the Court is familiar with those standards.  That

24  doesn't means Judge Hannan is saying there was a fraud here or

11:13   25  not.  I mean, he was just saying it's not to be dismissed at

11:13   1    that preliminary stage.

2              If he's successful -- I don't know whether he

3    will be or not, because the United States decided not to

4    intervene.  If he's successful, he's going to get a huge

11:13   5    bounty.  I mean, there's a reward in and of itself from qui tam

6    cases that -- like Mr. Clark said, it can be tens of millions

7    of dollars.  So, that's his reward.  If that's a successful

8    case, he will get his cut of the verdict, or the settlement, in

9    that case.  I don't think it in any way should benefit him in

11:13   10   an unrelated criminal case.

11             They also talk about his involvement in the

12   Sweezy case.  He did help the government.  You have the letter

13   from Mr. Louis.

14             THE COURT:  I do.

11:14   15             MR. COSTA:  That was all before this case started.

16   Defendants do all kinds of good deeds.  They contribute to

17   charities, some of them have served in the military.

18   Defendants do all types of good deeds before their criminal

19   case, that typically don't benefit them.  So, I don't see why

11:14   20   the fact that he testified truthfully in a case -- unrelated

21   case for the government, before this case ever arose, should

22   reduce his sentencing range or be an argument for a lower

23   sentence.

24             Part of -- when people get 5K's for substantially

11:14   25   assisting the government, part of that is because they,

11:14   1    themselves, have to accept their own -- accept responsibility

2    for what they did; and then, the other part, is that they

3    helped the government prosecute others.  I don't think he's

4    done either half, but he certainly hasn't done the first half.

11:14   5           And I actually gave Mr. Swetnam what I think is a

6    very rare and generous offer.  Even after he was convicted at

7    trial, I gave him the opportunity to cooperate against others

8    who were involved in this scheme.  He chose not to.  Perfectly

9    his right.  He shouldn't be punished in any way for making that

11:15  10    decision.

11           But I think that is relevant to whether he should

12    get a reduction for cooperating with the government when he has

13    specifically refused my request.  I don't think most

14    prosecutors would allow someone who went to trial to then still

11:15  15    cooperate.  He refused that request.

16           The final thing I would comment on is the abuse

17    of trust if the Court --

18        THE COURT:  Yeah, I would like to hear more about

19    that.

11:15  20        MR. COSTA:  Mr. Swetnam's position as an insurance

21    broker is what enabled him to commit this crime.  The hospital

22    trusted him to negotiate their policies; they trusted him to

23    receive the policies from the insurers and transmit them to the

24    hospital; and they trusted him to bill them and then he would

11:15  25    transmit the hospital's payments to the insurance companies.

11:15    1    All three of those trusted relationships he utilized to commit

2    the crime, both the Zurich crime of inflating the premiums by

3    altering those policy documents and the windstorm policy that

4    he created and passed on to the hospital.

11:16    5            He had a 20-year relationship with the hospital.

6    I disagree with this -- that he had no interaction with them.

7    Mr. Cook's testimony is clear that Mr. Swetnam would call

8    Mr. Cook, who was in charge of insurance at the hospital.  They

9    would -- and Mr. Swetnam would tell him what prices he was able

11:16   10    to obtain in New York.

11            He actually got Mr. Cook his job at the hospital.

12    He was dealing with Valley Baptist before Mr. Cook ever worked

13    there.  And Mr. Swetnam said, "Oh, why don't you interview with

14    them?  I can help you get a job there," in the late Eighties.

11:16   15    So, he had a strong, strong relationship of trust with

16    Mr. Cook.

17            You asked Mr. Clark if he was saying it's always

18    true that a broker could never be an abuse of trust situation

19    or if it's just this case.  And I think it is a fact based

11:16   20    determination.  It might not always be the case.  But if there

21    is a case where a broker had a trust relationship with their

22    client, I think this is it, given the over 20 years of

23    dealing -- and it's a small community.

24            I would point to the Fifth Circuit case from a

11:17   25    few years ago that found a mortgage broker was in a trust

11:17   1   relationship with a mortgage lender whom they submitted the

2   lending documents to.  I mean, this is a much greater trust --

3   stronger trust relationship.  He had a lot of personal contact

4   with the hospital.  It's a much higher dollar account than a

11:17   5   typical mortgage application.

6             And the way those mortgage brokers work, I mean,

7   they're dealing with all kinds of lenders.  They're dealing

8   with a large, large number of applications.  Here, this was a

9   multimillion dollar client.  There was a strong personal

11:17   10  relationship.  And the Fifth Circuit, in that case, said it

11  was -- that the fact that the lenders had in some way relied on

12  the lender -- I'm sorry -- the broker to submit reliable

13  information supported application of the enhancement.

14            Well, here, I think there was a great deal of

11:17   15  trust that Mr. Swetnam was transmitting legitimate documents,

16  was sending bills that reflected the real prices and, most of

17  all, was submitting policies that did in fact exist.  So, I

18  think it's a stronger factual scenario for application of the

19  enhancement than existed in that mortgage situation or in other

11:18   20  cases I cited.

21            THE COURT:  Thank you very much.

22            Mr. Renteria?

23            THE PROBATION OFFICER:  Good morning, your Honor.

24            THE COURT:  Good morning.

11:18   25            THE PROBATION OFFICER:  With respect to the issues

11:18    1    that are -- objections that were noted by defense counsel, the

2    probation office maintains its position as noted in the

3    addendum with regards to the issue of abuse of trust and the

4    enhancement on acceptance of responsibility.  With regards to

11:18    5    the recommendation, we have nothing further to add than what's

6    stated on our recommendation.

7            THE COURT:  Thank you.

8                Gentlemen, anything further?

9            MR. WEISFELD:  Your Honor, I believe that Smith

11:18    10   Reagan, which was the company that dealt with the board of

11   directors --

12           THE COURT:  Yes, sir.

13           MR. WEISFELD:  -- no charges.  They had a civil

14   settlement of $1.2 million.  I tender to Mr. Costa, there

11:19    15   was -- during the civil suit --

16           THE COURT:  Do I have whatever you tendered to him?

17           MR. WEISFELD:  No, not yet.  I was going to let him

18   read it first, your Honor.

19           THE COURT:  Okay.

11:19    20   MR. WEISFELD:  Mr. Scott Lieberenz had a deposition

21   during the trial -- during the deposition, [sic] on the civil

22   case.  And his deposition said that he felt that Mr. Swetnam's

23   responsibility was less than $1.5 million.  So, that would be

24   the argument.

11:19    25           We would tender for, your Honor, the cover

11:19   1   sheet --

2                   THE COURT:  Give it to Ms. Loewe, if you would.

3                   MR. WEISFELD:  I apologize.

4                        On Page 49, your Honor, of the deposition.

11:19   5                   THE COURT:  And the gentleman's name, for the court

6       reporter, is spelled L-I-E-B-E-R-E-N-Z.

7                   MR. WEISFELD:  Your Honor, Mr. Lieberenz --

8                   THE COURT:  Let me absorb this first.

9                   MR. WEISFELD:  Yes, your Honor.

11:20  10                   THE COURT:  Okay.

11                  MR. WEISFELD:  And he is the CFO for the company, your

12      Honor, for The Valley Baptist.  And that's -- would be the

13      argument, is if the hospital is out, that that was their own

14      CFO making that statement.

11:20  15                        Your Honor, if Smith and Reagan weren't charged,

16      it would seem to be, your Honor -- if there was an error in the

17      policy, it would make sense that they would approach

18      Mr. Swetnam with a letter saying there's a problem.  That's how

19      most civil case -- most claims are initially handled.  There

11:21  20      never was -- Mr. Lieberenz acknowledges in his deposition,

21      there never was a letter sent.

22                        It just, your Honor, it was an error.  There was

23      an error in the Landmark case that David Smith issued.  There

24      was coverage, your Honor.  The hospital would have been --

11:21  25      there's the E & O coverage that I sent to your Honor that I

11:21  1   also -- I also gave to Mr. Costa.  There was a policy that

2   covered the time certain from -- covering Swetnam Insurance

3   up -- Michael N. Swetnam doing business as Swetnam Insurance

4   Services, during the period of time, that would have covered a

11:21  5   claim of $2 million.

6             You have a letter from the civil attorney Joel

7   Resendez.  I was present, your Honor, when we spoke to

8   Mr. Hanslik, when we spoke to Trey Martinez.  If it's about

9   money, here's the money.  The money was there.

11:22  10            Your Honor, I just don't understand --

11   Mr. Springfield, who was the CEO of this hospital, had a

12   personal interest in getting the things done the way my client

13   did for him.  Mr. Carter on the 2006 policy -- I beg to differ

14   with the $30 million of Mr. Costa's claim that the hospital --

11:22  15   if they had had -- there were hurricanes before.  The problem

16   was -- the basic coverage is where the problem was with

17   Alliant.  The basic coverage, they didn't have.

18            We're talking about the top coverage, your Honor.

19   We're talking about it's a layered.

11:23  20            THE COURT:  I understand.  I understand layers.

21            MR. WEISFELD:  It would have never -- this was done to

22   protect their bond ratings, your Honor.  That's the reason the

23   policy -- it would have cost $25 million --

24            THE COURT:  Okay.  I'm not certain what we're arguing

11:23  25   about now.  Are we arguing about the basic issue of guilt or

1    are we arguing about something else?

2              MR. WEISFELD:  No.  We're -- we don't -- how guilt

3    occurred, what led up to the offense.

4              THE COURT:  Okay.  All right.

5              MR. WEISFELD:  What led up to the offense was the

6    chairman of the executive board deciding -- the one running the

7    hospital -- decided that he needed the coverage because it

8    would cost $25 million for that top percentage to get -- so

9    their bonds would stay at the proper rating.  It falls apart.

10   He tries to sell it.  It falls apart.  That's why Mexico

11   occurs.  That's the screw-up that he makes.  That's the error

12   he makes.

13             The CEO got a $2.5 million bonus that year.

14   Mr. Vela got almost a half a million dollars that year.

15   Everybody was eating at the trough, your Honor.  He's the one

16   holding the bag.

17             This man deserves getting probation, your Honor.

18   You're never going to see this man again.

19             THE COURT:  I do believe that.  I do believe that.

20             MR. WEISFELD:  And what purpose would it serve, like

21   you said about the young fellow before, us paying for somebody

22   like that?  This man can get a job.  There's a company that --

23             THE COURT:  Well, there's something to that.  He owes

24   an enormous amount on restitution.

25             MR. WEISFELD:  An enormous amount on restitution.

11:24   1          THE COURT:  And he needs to make a dent in that.

2       That's always a question in these restitution cases.

3               MR. WEISFELD:  And that's where we would like to leave

4       your Honor.

11:24   5               You know, with all respect to Mr. Costa -- I

6       mean, I've come to know him, I've come to respect him.  He's a

7       very, very adequate warrior.

8               THE COURT:  No.  He's better than that.  But anyway,

9       come to your point.

11:25   10              MR. WEISFELD:  Your Honor, I don't think this man

11      needs to go to prison.  I don't know who would benefit for him

12      to go to prison.

13              THE COURT:  Well, I know.  I don't know that -- I

14      mean, I don't know who's benefiting from Bernie Madoff being in

11:25   15      prison.  But can we have a system where you can get caught in a

16      financial misconduct, you just announce your shame and get no

17      time?  I mean, that can't work, can it?

18              MR. WEISFELD:  Your Honor, let him pay it back, let

19      him work to pay it back.  What purpose will it serve?  To what?

11:25   20      To Valley Baptist?

21              Valley Baptist has taken Medicare for $2 billion.

22      Let's see -- let's see -- okay.  Mr. Costa's is laughing.

23      That's what the claim is.  Let's see what the settlement is.

24              THE COURT:  Okay.  Well, Mr. Costa, you want to

11:26   25      respond?

11:26   1          MR. COSTA:  And I don't want to retry the case, your

2       Honor.  I do just have a few brief responses.

3              I think if there was any question about whether

4       he was entitled to acceptance of responsibility, the position

11:26   5       they're maintaining today should end any of those notions,

6       because they're -- it's straightforward.  He sold two policies

7       that did not exist.  He made up the names, he forged the

8       signature of the lawyer down in the British Virgin Islands.

9       They didn't exist.  He got about a million a policy, kept it,

11:26  10       gave some to his partners.

11             And they're trying to say, well, Springfield is

12      the one wanted this offshore program.  No one wanted a policy

13      that didn't exist, to pay a million dollars for it.  It's black

14      and white.  And I think their comments are mostly irrelevant

11:26  15      but certainly reject any notion that he's accepted

16      responsibility.

17             And then I'd finally just say on the issue of

18      what's the purpose of sentencing, I mean, their interest now is

19      even challenging philosophical questions about all of this --

11:26  20          THE COURT:  I feel those same concerns.  I mean, I

21      know that.  I wrestle with that all the time.  But as I said, I

22      don't think we can have a system where if you're caught you

23      announce your regrets and then that's the end of the story.  I

24      don't think that would work.

11:27  25          MR. COSTA:  And, your Honor, you know, they say he can

11:27   1    work, he can pay off this money.  It's been almost four years.

2    He hasn't paid off the money.  He hasn't worked for the last

3    couple of years.  So, why all of the sudden, is he going to be

4    able to work if he's put on probation?  I'm not sure how that's

11:27   5    going to happen.

6            THE COURT:  Well, nobody would hire somebody who's on

7    their way to prison.  I do see he might -- his job prospects

8    would improve if he got probation.  But, no, I don't think

9    there's much of a dent made on the amount that is being

11:27   10   recommended as restitution.

11            Anything further, Mr. Renteria?

12            THE PROBATION OFFICER:  Nothing further, your Honor.

13            MR. COSTA:  Your Honor, I did just want to make sure

14   you received the hospital's victim impact letter.

11:27   15            THE COURT:  Yes.  From Mr. Vela?

16            MR. COSTA:  Yes.

17            THE COURT:  That's -- yes.

18            Okay.  We'll take a short break.  No one need

19   rise.

11:27   20        *(Recess was taken from 11;27 a.m. to 11:33 a.m.)*

21            THE COURT:  Okay.  Anything more from anyone?

22            MR. CLARK:  Judge, I think that just -- again, I don't

23   want to be redundant, but the whole issue about Smith and

24   Reagan as similarly situated individuals and that I think is a

11:34   25   properly part of the consideration under 3553 and how other

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:34  1    individuals are being assessed.

2                    And, again, with all respect to him, I do think

3    that Mr. Costa is a very capable adversary.

4            THE COURT:  No.  This case -- I was beneficiary of

11:34  5    some excellent lawyering on both sides.  I acknowledge that.  I

6    wish all cases were like that.

7            MR. CLARK:  Justice here is, in my mind, a question of

8    proportionality.  And that's why we think the variance issue

9    is --

11:34  10           THE COURT:  I am going to grant a variance.  I am

11   going to grant a variance.

12                   I really -- the whole issue of whom is charged in

13   any large case is always a concern to me.  But that -- I mean,

14   those decisions are made way above my head; and I really can't

11:34  15   fault anyone that someone was not charged.

16                   I just simply do not understand all the variables

17   that went into that decision.  I mean, it may be that --

18           MR. COSTA:  Your Honor, may I identify a few of them?

19           THE COURT:  -- other people might have been senile,

11:35  20   other people might have been at home in convalescence, other

21   people might have been legitimately unaware of what was going

22   on.  I just can't fix that at this point.

23                   Yes, Mr. Costa.

24           MR. COSTA:  I would just identify a few reasons for

11:35  25   the record why Mr. Swetnam and Carter were prosecuted.  But

*Cheryll K. Barron, CSR, CM, FCRR*                            *713.250.5585*

11:35   1   specifically Mr. Swetnam, he was the only one of the four who

2   received proceeds from all four fraudulent policies; and that's

3   because he was involved in all four.

4          He created the scheme.  He was the one who

11:35   5   created the names and the fake cover notes for the windstorm

6   policies.  Reagan had nothing to do with either one of those or

7   didn't receive any of the proceeds from either one of those.

8          And he dealt with Zurich, and he received the

9   Zurich policy and passed on the altered policy.  So, both

11:35   10  factually and in terms of the money, he was the most involved.

11          Mr. Carter, we thought, was the second most

12  involved.  And I accept responsibility for the fact that we

13  don't think the truth came out with regard to him.

14          Smith and Reagan only received proceeds from a

11:36   15  much -- a smaller number of the four policies and had a lot

16  less direct involvement, based on the evidence we had.

17          But the bigger picture is, you know, you sentence

18  drug defendants all the time.  I guarantee you last night there

19  were hundreds of guys out on the street of Houston dealing

11:36   20  drugs --

21          THE COURT:  I know.

22          MR. COSTA:  -- who aren't going to see a day of

23  prison.  So, just the nature of the system, unfortunately, to

24  some extent.

11:36   25          THE COURT:  Yeah, I know that.

11:36   1          I do think that the prosecution has, by far, the

2    better side of the argument on each of the objections.  But --

3    and the other objections, I haven't forgotten those other

4    objections that do not bear on sentencing ranges, I'm not going

11:36   5    to confront.

6          But I'm, nonetheless, going to grant the

7    objection as to the position of trust because I do think the

8    law is somewhat murky on that question.  I'm -- again, I do

9    think the prosecution and Mr. Renteria have the better side of

11:37   10   the argument; but I am nonetheless going to grant that

11   objection on the basis of lenity.

12          And in terms of the variance, my concerns are

13   several.  But one of my primary concerns is -- and it's part of

14   each first-time offender's case.  I really do not like the

11:37   15   thought of a first-time offender, who I think we all agree is

16   not going to re-offend, getting such a hefty prison sentence.

17   I -- it seems to me that punishment ought to be incremental.

18   And somebody who's not been in trouble with the law, other than

19   immaterially, to get such a hefty sentence for the first time

11:38   20   out of the chute, that seems to me disproportionate and not

21   consistent with the goals of 18, USC, 3553.

22          In other words, I think a lesser sentence would

23   serve all the interests of justice just as well as a greater

24   sentence.  So, that may be wrong; and I know it will be

11:38   25   appealed in this case.  The government may well want to take

11:38  1    that up on appeal.  But the fact that white collar criminals

2    can submit supportive letters and the fact that we do take them

3    out of society's productive realms really could be said of

4    every white collar defendant who's received publicity in recent

11:39  5    times.  I mean, that's absolutely true of Bernie Madoff.  And I

6    don't think anybody stood up asking for him to receive a

7    sentence of probation.

8            So, I'm going to depart six levels from the level

9    27 to a level 21 and impose a sentence of 37 months on each of

11:39  10   the counts of conviction, 3S, 4S, 5S; and that will be a total

11   of 37 months to run concurrently.

12           Supervised release, likewise, to run

13   concurrently, three years as to each of those counts.

14           Restitution in the amount of $2,950,301, a

11:39  15   special assessment of $300.

16           Voluntary surrender will be allowed.

17           While on supervised release and pursuant to

18   instructions of the probation office, defendant shall not

19   commit another crime, shall not possess a firearm, shall

11:40  20   participate in a program for treatment of drug and/or alcohol

21   addiction, shall provide probation all requested financial

22   information, and shall cooperate in a collection of a DNA

23   sample to the extent authorized by law.

24           You do have 10 days to file an appeal.

11:40  25           And you have no objection to voluntary surrender,

11:40  1   do you?

2            MR. COSTA:  That's correct, your Honor.

3                 I do have a couple of other issues.

4            MR. CLARK:  Judge, a couple of things if I could?

11:40  5            THE COURT:  Yes, sir.

6            MR. CLARK:  Could you recommend, for the designation

7   of the facility, the Fort Worth facility, to be closer to --

8            THE COURT:  I'll do that; but they pay no attention to

9   judicial recommendation, none.

11:40 10            MR. CLARK:  I appreciate that.

11            THE COURT:  Okay.

12            MR. CLARK:  And, secondly, because of the issue of the

13   drinking history that the probation officer has pointed out and

14   now that the Court has ordered incarceration, to the extent

11:40 15   that he is eligible for the intensive inpatient program --

16            THE COURT:  I'll recommend that.

17            MR. CLARK:  -- I would ask -- thank you, your Honor.

18            MR. COSTA:  Two issues on our end, your Honor?

19            THE COURT:  Let me hear Mr. Renteria first.

11:41 20            THE PROBATION OFFICER:  Your Honor, I just want to

21   clarify the payment schedule as noted in the --

22            THE COURT:  It's going to be as set forth in your

23   recommendation.

24            THE PROBATION OFFICER:  Thank you, Judge.

11:41 25            MR. COSTA:  You mentioned the possibility of an appeal

11:41   1   or a cross appeal really, and that's -- those decisions are

        2   made far above my pay grade.  But for the record, given that

        3   possibility, I would just note -- I think the abuse of trust,

        4   we've already made our position clear.

11:41   5               On the downward variance for lack of criminal

        6   history, I would just note that the government believes the

        7   advisory guideline range, which had him in criminal history

        8   category one, already accounts for that fact.

        9               THE COURT:  Okay.  Thank you, very much.

11:41   10              MR. COSTA:  The second issue, your Honor, we have that

        11  pending motion for forfeiture, which we actually -- was filed

        12  over a year ago; and we filed a renewed motion yesterday.

        13              THE COURT:  Is there any objection to that?

        14              MR. CLARK:  Your Honor, only to advise the Court there

11:41   15  is an IRS lien on his home.

        16              THE COURT:  Well, that doesn't affect this order,

        17  though.

        18              MR. WEISFELD:  That doesn't, no, your Honor.

        19              THE COURT:  Okay.  I'll sign it.

11:42   20              MR. COSTA:  Thank you, your Honor.

        21                  That's all from the government.

        22              THE COURT:  This is the 9th, right?

        23              MR. COSTA:  Yes.

        24              MR. CLARK:  And we're advising the Court that there is

11:42   25  an innocent spouse involved.  And I'm assuming the government

11:42  1    is not trying to forfeiture her community interest.

2              MR. COSTA:  Well, the order asks for half of it.  I'll

3    let Ms. Rollinson address that.

4              MS. ROLLINSON:  Yes, your Honor.  We're forfeiting the

11:42  5    payment of fraud payments, the $77,526 --

6              THE COURT:  You're going way too fast.

7              MS. ROLLINSON:  Sorry, your Honor.

8              THE COURT:  Start over again.

9              MS. ROLLINSON:  We are forfeiting the payment of

11:42 10   $77,526.91 that was made of the fraud proceeds.  And there's no

11   community interest in fraud proceeds.  Then, if we enforce the

12   money judgment later, then we account for the spouse's interest

13   in half of the money and the defendant's interest in the other

14   half.

11:42 15             THE COURT:  Whatever the law is, it's going to work

16   that way.

17             MR. CLARK:  We understand, your Honor.  We understand.

18             THE COURT:  Thank you all very much.

19       *(End of requested proceedings)*

20                         * * * * *

21

22

23

24

25

1                     COURT REPORTER'S CERTIFICATION

2           I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled cause.

3

4   Date:   July 11, 2011

5

6                            /s/   Cheryll K. Barron

7                      Cheryll K. Barron, CSR, CMR, FCRR
                       Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25